## Case No. 9,290.

### MATTHEWS v. OFFLEY.

[3 Sumn. 115.][1]

Circuit Court, D. Massachusetts. Oct. Term, 1837.

SHIPPING—PENALTIES—ACTION — HOW BROUGHT— DESTITUTE SEAMEN—REFUSAL TO TRANSPORT— AMERICAN SEAMEN—WHO ARE—DESERTION.

1. An action for a forfeiture or penalty must be brought in the name of the government, and not of a private person, unless some other mode is expressly provided by statute.

[Cited in United States v. Chapel. Case No. 14,781; Briscoe v. Hinman, Id. 1,887; United States v. Willetts, Id. 16,699.]

[Cited in Ransdell v. Patterson, 1 D. C. Ct. of App. 491.]

2. Under the act of congress of 1803. c. 62, [2 Story's Laws. 883; 2 Stat. 203. c. 9], providing for the recovery of a penalty, for the benefit of the United States. where a master refuses to take destitute seamen on board and transport them to the United States, the action for the penalty must be brought in the name of the United States, and not of the consul or vice-consul.

3. Under the act above mentioned, the certificate of the consul is prima facie evidence of the refusal of the master to take the seamen on board. and of all the facts stated in the enacting clause. which are necessary to bring the case within the penalty.

[Approved in Burbank v. People. 90 Ill. 555. Cited in Holmes v. Hunt. 122 Mass. 517.]

4. If a seaman be entitled to the privileges of an American seaman, and be destitute, the consul is the proper judge as to the ship on board of which he should be placed for his return to the United States.

5. Foreigners. while employed as seamen in the merchant-ships of the United States, are

[1] [Reported by Charles Sumner, Esq.]

deemed to be "mariners and seamen of the United States," within the language and policy of the act of 1803, c. 62 [c. 9].

[Cited in United States v. Parsons, Case No. 16,002; Dustin v. Murray, Id. 4,201; Re Ah Tie, 13 Fed. 293.]

6. The fact of desertion from an American ship,—whether she be in port or not at the time when the seaman becomes destitute,—does not supersede the authority of the consul to require another American ship to bring him to the United States.

[Cited in Re Ah Tie, 13 Fed. 293.]

Error to the district court of Massachusetts in an action of debt, brought by the defendant in error, against the plaintiff in error, to recover the penalty of one hundred dollars, prescribed by the act concerning consuls, &c., of the 28th February, 1803 (Act 1803, c. 62 [2 Story's Laws, 883; 2 Stat. 203, c. 9]), for his refusal, as master of the brig Gem, to take a destitute seaman of the United States on board at the port of Smyrna, at which the defendant in error was vice-consul of the United States.

The declaration was in substance as follows:—"For that the said Matthews, heretofore, to wit, on the 28th day of September last past, was the master and commander of a certain brig called the Gem, a ship or vessel of the said United States, owned by certain citizens thereof, whose names are as yet unknown to the said vice-consul; and which said brig, then lying in the port of Smyrna aforesaid, being a foreign port, was bound to the port of Boston, a port in the said United States; and he, the said Matthews, then and there being the master of said brig, was requested by the said vice-consul to take on board the said brig one William Mann, being then and there a destitute seaman of the said United States, and to transport the said Mann to the port of Boston aforesaid; and the said vice-consul then and there tendered to the said Matthews the sum of ten dollars, as a compensation for receiving and transporting the said Mann as aforesaid; but the said Matthews did then and there wholly refuse to receive the said Mann on board the said brig, against the law, peace, and dignity of the said United States, and contrary to the form of the statute of said United States in such case made and provided: By reason whereof, and by force of said statute, the said Matthews has forfeited and become liable to pay the sum of one hundred dollars, to be recovered for the benefit of the said United States, by the said vice-consul, in his own name. Yet the said Matthews, although often required, has not paid to the said consul the said sum," &c.

Upon the trial upon the issue of nil debet in the district court [case unreported], a verdict was found for the original plaintiff, upon which judgment was entered; and a bill of exceptions being taken at the trial by the original defendant, the cause was now brought to this court.

The bill of exceptions was in substance as follows:—To maintain the issue on his part, the plaintiff's counsel offered in evidence the certificate of the plaintiff, as vice-consul of the United States for the port of Smyrna, which is in the words and figures following, viz.:

"Consulate of the United States. I, David W. Offley, vice-consul of the United States, hereby certify, that on the twenty-eighth day of the present month of September, as vice-consul aforesaid, I requested Richard Matthews, master and commander of the brig Gem, of Boston, of the burthen of one hundred and sixty-one tons, or thereabouts, then being a vessel belonging to a citizen or citizens of the United States, and lying in the port of Smyrna, to take on board his said brig William Mann, a seaman of the United States, and then being destitute within my official district, and to transport him to Boston, the port for which the said brig was then destined and soon to sail, on such terms not exceeding ten dollars for the said seaman; and that I then and there tendered to him, the said Richard Matthews, the sum of ten dollars for the said seaman as a compensation for receiving and transporting him as aforesaid, the said seaman being ready to be received (and then and there present) by the said Richard Matthews on board his said brig. But the said Richard Matthews, then and there and ever afterwards, altogether refused and neglected to receive the said seaman on board his said ship, and to transport him as aforesaid. In faith whereof, I have made this certificate under my hand and official seal, at Smyrna, this 30th day of September, one thousand eight hundred and thirty-six. (L. S.) (Signed) David W. Offley, Vice-Consul."

"I, David W. Offley, vice-consul, do hereby certify that the foregoing is a true copy from the original, existing in the register of this consulate. Witness my hand and the seal of office, at Smyrna, this 30th day of September, 1836. David W. Offley, Vice-Consul."

This was objected to as evidence of any facts therein stated, except the refusal of the defendant to take said seaman on board, but the district judge admitted the said certificate as primâ facie evidence of all the facts therein certified to. The plaintiff's counsel also produced and put into the case a customhouse copy of the list of the crew of the ship Mars for the voyage referred to in the deposition hereinafter mentioned, and the name of the said William Mann there appeared as one of the said crew.

The defendant's counsel requested the judge to order the plaintiff to be nonsuited, because the action should have been in the name of the United States, and not in the name of this plaintiff; but the judge ruled that the action was rightly brought in the name of this plaintiff.

The defendant's counsel further requested the judge to instruct the jury, that if the said

seaman had deserted from the ship Mars at Smyrna, the consul had no authority to require the defendant to take the said seaman on board his vessel, while the Mars was lying in the port of Smyrna, but should have restored him to the ship Mars; and that while the Mars was lying in the port of Smyrna, the said seaman was not a distressed seaman within the meaning of the statute on which the action was founded. And he further requested the said judge to instruct the jury, that, if the said William Mann was a British seaman, he had no American character, except while he continued to be one of the crew of an American ship, and that, by deserting from the Mars in the port of Smyrna, his American character was at an end, and he was no longer entitled to protection and relief as an American seaman. But it was left to the jury to consider and determine, whether it was satisfactorily proved by the evidence given, that the said William Mann was an Englishman, or a deserter from the ship Mars; or whether the ship Mars was in the port of Smyrna when the defendant was required by the consul to receive the said Mann on board the brig Gem, of which he was master. And the jury were further instructed by the judge, that the consul might rightfully judge on board of what vessel, then being in the port of Smyrna, belonging to a citizen of the United States, and bound to the United States, he would place the said William Mann, if then and there a destitute mariner of the United States in that port, though it were now proved, that the said William was at that time an English subject, and a deserter from the ship Mars; that, having acquired the character of a mariner of the United States, by becoming one of the crew of the ship Mars, in manner above stated, he was, if destitute or in distress, entitled to relief from the consul of the United States, under the act of congress on the subject; and the consul might rightfully require the defendant to receive him on board for conveyance to the United States, on the terms specified in and by the act aforesaid; and that the defendant, master of the ship Gem, could not legally refuse compliance with such requirement, on the ground, that the ship Mars, of which the said William Mann was one of the mariners, was at that time in the port of Smyrna.

B. R. Curtis, for plaintiff in error.

Mr. Mills, Dist. Atty., for the other side.

STORY, Circuit Justice. Three questions have been made and argued at the bar. The first is, whether the present action is well brought by the vice-consul in his own name to recover the penalty, or whether the action ought not to have been brought in the name of the United States. Upon general principles, where a pecuniary penalty or forfeiture is inflicted for any public offence or wrong, it seems clear, that the action to recover the penalty or forfeiture must be brought in the name of the government, and not in the name of any private party, unless some other mode for the recovery is prescribed by some statute; and the usual remedy in cases of a pecuniary penalty is an action or information of debt by the government itself. Ex parte Marquand [Case No. 9,100]. This is the rule of the common law; and, therefore, it has been held, that a suit will not lie by a common informer for such a penalty, unless power is given to him for that purpose by statute (Fleming v. Bailey, 5 East, 313); neither will an indictment lie for such a penalty, unless also specially allowed by statute (Rex v. Malland, 2 Strange, 828; Ex parte Marquand [supra]), for it is properly recoverable as a debt in a court of revenue, by the government; and is in no just sense, a criminal proceeding. The whole question on this point, then, resolves itself into this: whether the present action by the vice-consul has been authorized by any statute of the United States.

The act of 1803, c. 62 [c. 9], on which this suit is founded, in the 4th section, makes it the duty of our consuls and vice-consuls, &c., to provide for destitute seamen within their districts; and requires all masters of American vessels bound to some port of the United States on request of our consuls and vice-consuls, &c., to take such seamen on board, and transport them to the United States upon certain terms and conditions prescribed by the act; and inflicts upon the masters a penalty of $100 for refusing so to do. Nothing is said in the act as to the person by whom, or the mode in which, this penalty shall be sued for or recovered "for the benefit of the United States, in any court of competent jurisdiction." Now, this section is a substitute for the seventh section of the act of 1792, c. 24 [1 Stat. 255], on the same subject, which the act of 1803, c. 62, § 5 [2 Story's Laws, 883; 2 Stat. 203, c. 9], has repealed; and which prescribed, that the penalty therein provided for the like refusal of the masters, should be sued for and recovered "for the benefit of the United States, by the said consul or vice-consul in his own name, in any court of competent jurisdiction." The omission of these latter words in the act of 1803, c. 62 [c. 9], would seem to furnish a clear proof of a change of the legislative intention as to the mode of suing for the penalty; and it seems to me, is decisive of the question. The omission of the words must be attributed to design, and leaves no ground, upon which a court of justice can presume any right or authority of the consul or vice-consul, &c., to sue; since the whole penalty is to be for the benefit of the United States. The second section of the act of 1803, c. 62 [c. 9], furnishes also an indirect argument to the same effect. By that section, the masters of American ships, on their arrival in foreign ports, are required to deposit the ship's papers with the American

consul or vice-consul, &c.; and it inflicts upon the master, for the refusal or neglect so to deposit them, a penalty of $500, which is to be recovered "by the consul, or vice-consul, &c., in his own name, for the benefit of the United States, in any court of competent jurisdiction." The common maxim is, "Expressio unius est exclusio alterius." If the legislature meant to provide for the recovery of the penalty in the same manner, in each case, they would have naturally used the same language, and have inserted the same provisions. But, if we are satisfied that the omission was purely the result of accident, or negligence, or mistake, it would not aid the court on the present occasion; for courts of justice are not at liberty to supply the defects of legislation, even if they were at liberty to presume them to be unintentional, or founded in mistake or negligence. My opinion is, therefore, that this point is fatal to the very foundation of the present suit. But counsel on each side have requested the court to give an opinion upon the other points in the cause, in order to settle the merits of the controversy, which would otherwise be brought forward in another suit, in the name of the United States.

The next question is to the ruling of the learned judge of the district court, in admitting the certificate of the vice-consul, stated in the bill of exceptions, as prima facie evidence of all the facts therein certified; whereas, the counsel for the original defendant contended, and now contend, that it was not evidence, except of the refusal of the defendant to take the seaman on board. The fourth section of the act of 1803, after the provisions which have been already alluded to, proceeds to declare, "And the certificate of such consul or commercial agent, given under his hand and official seal, shall be prima facie evidence of such refusal, in any court of law having jurisdiction for the recovery of the penalty aforesaid." The whole question turns upon what is to be understood as intended to be included in the statute. Is it the dry naked fact, that the master refused to take a seaman on board, giving his name, at the request of the consul, &c.? Or does the statute mean by the words "such refusal," a refusal under the circumstances stated in the preceding part of the section? My opinion is, that the latter is the true interpretation of the statute. It meant to provide, that the certificate should contain and be evidence, prima facie, of all the facts stated in the enacting clause of the section, which is necessary to bring the case within the penalty; for all those facts are indispensable to make it "such refusal" as the statute contemplates. Upon any other construction the enactment would be wholly nugatory for all the purposes of enforcing the statute; since every material fact to enforce the penalty must be proved aliunde the certificate. The statute placed confidence in the consul, as a public officer, bound to the performance of highly responsible duties, and meant to make his certificate the proper and ordinary proof, though not conclusive proof, of all the facts to sustain a suit for the penalty. That is to say, it meant that he should certify, that the seaman was a seaman of the United States, was destitute, that he requested the master of an American ship, bound to the United States, to take him on board and transport him to a port of the United States, for the statute compensation, with a proviso that he should not be compelled to take more than two seamen for every one hundred tons burthen of the ship, and that he refused so to do. "Such refusal," and no other, would constitute an offence within the statute; and such refusal and no other is to be certified. Now, the present certificate contains the allegations of these necessary facts; and none other; and, therefore, it seems to me, that it was properly admissible, in the whole, according to the ruling of the district judge.

The third and last question is, as to the instruction given to the jury by the district judge upon the prayer of the counsel for the original defendant. The instruction in substance was, that the consul was the proper judge on board of what American vessel he would place the seaman (William Mann), if destitute; that if he was an English subject, and a deserter from another American ship (The Mars), then in the same port of Smyrna, yet, having acquired the character of a seaman of the United States by becoming one of the crew of the Mars, he was, if destitute, entitled to relief from the consul, and the consul might rightfully require the original defendant to take him on board; and the defendant could not lawfully refuse to take him on board, on the ground of his being a deserter from the Mars, and her being in the same port.

In regard to the first part of the instruction, it does not seem to me that there can be any real ground for doubt. If a seaman be entitled to the privileges of an American seaman, and be destitute, the consul is the proper judge on board of what ship he should be placed, for his return to the United States.

In regard to the other parts of the instruction, it has not been contended that no other destitute seamen are within the act of 1803, c. 62 [c. 9], except those who are American citizens. It is notorious, that our laws authorize and allow foreigners to be employed as seamen in the merchant-ships of the United States; and while so employed, they are clearly within the protection of our laws; and it seems to me they are to be deemed to be "mariners and seamen of the United States," within the language and policy of the act of 1803, c. 62 [c. 9]. There seems a studious caution in the act not to confine the relief to American citizens; but to give the benefit of it to all seamen in the merchant service, whether natives or foreigners. But the argument is, that foreigners are no longer

to be considered as holding the character of "mariners and seamen of the United States," than while they actually belong to a ship of the United States in that character. I greatly doubt if that proposition is maintainable in its full extent. Many cases may be stated, in which such a construction would involve great inconveniences and hardships, and be repugnant to the sound policy of the act. Suppose, for example, an American ship, with some foreigners composing a part of her crew, should be totally lost by shipwreck on a foreign coast; or should be captured and condemned in a foreign country; or should be sold in a foreign country; it would be a violent construction of the act to insist, that because the foreign seamen were absolved from their contract by such a disaster or sale, they were to lose their character as American seamen, although they were intent upon an immediate return to the country for the purpose of engaging anew in our merchant's service, and they and their families had a known domicil in the United States. Suppose a foreign seaman should be left ashore by one of our ships, on her departure from a foreign port, by accident, or mistake, or design; it would be difficult to support the doctrine, that he thereby lost his character as an American seaman in such a case, if his avowed domicil was in the United States. I do not know, that it ought to make any difference, if the case should be that of a foreign seaman voluntarily discharged from an American ship in a foreign port; or turned ashore for gross misconduct; or compelled to quit the ship from cruelty or gross ill treatment by the officers of the ship; if in each of these cases the seaman had his domicil in the United States, and had a bonâ fide intention to return to and remain in our marine service. It seems to me, that, where a foreign seaman has once acquired a domicil in the United States, and is engaged in our merchants' service, and retains, if I may so say, the habits of that service, and upon every discharge from one ship still has the animus revertendi to that service and domicil, he must be treated as intending to retain his acquired character of an American seaman, and his acquired American domicil. Some overt act on his own part, such as engaging in some foreign service, or resuming his original native character, or disowning his American character and domicil, seems to me indispensable to rebut the presumption that he still attaches himself to the American service. It does not strike me that his desertion from another American ship, at least, unless followed up by engaging in some foreign service, ought to have such an effect. If his desertion be without good cause and unjustifiable, although he has broken the shipping articles on his side, it is not dissolved. He cannot shake off his contract in this way. He is still in contemplation of law a seaman of the ship from which he deserted, and

may be compelled to return to duty. If, on the other hand, upon his desertion the master justifiably declines to take him on board again, and cuts him adrift from the ship's service, he will then be discharged from the ship's service; but it by no means follows, that he is to be deemed discharged from the American marine service altogether, or that he has ceased, ipso facto, against his will, to be entitled to the protection of American seamen. I am, therefore, by no means prepared to admit that the fact of desertion from the Mars, if fully established, would, in this case, prove that the seaman was not entitled, if destitute, to the privileges of the act.

Nor do I think that the fact of the Mars being in port, supposing the seaman to have deserted from her, would per se establish that he was not a destitute seaman within the sense of the act. If the master of the Mars would not receive him on board again, he might be truly said to be a destitute seaman, if he could not find any other employment in the American service. The fact that the Mars was at the time in port would be a strong ingredient in the case to establish that he was not a destitute seaman, if he would have been received again on board of the ship for duty. But of itself it cannot be held, in point of law, as conclusive proof that he was not destitute. But I do not find that this point was ever required to be put to the jury under this aspect. Nor do I find any thing in the instructions of the district judge which precluded the jury from taking this matter into consideration, as matter of fact. For these reasons it does not appear to me, that there is any error in the instruction of the district judge given to the jury. The mere dry fact, that a seaman has deserted from an American ship, whether she be in port or not at the time, when the seaman became destitute, does not seem to me to supersede the authority of the consul to require another American ship to bring him to the United States. If the ship, from which he has deserted, has left the port, I do not understand, that the argument insists, that the consul may not, if he is destitute, require him to be brought home in another ship. Mere desertion, then, does not oust the consul's authority, or disqualify the seaman from the protection and assistance intended by the act. The fact of the ship's being still in port, from which he deserted, does not, in point of law, show, that he is not destitute, however proper, as a matter of fact, it may be for the consideration of the jury on that point.

Upon the whole my opinion is, that the two last objections to the ruling of the district judge are not maintainable. But, inasmuch as the suit is not brought in the name of the United States, and the vice-consul is not authorized by law to bring it in his name, the judgment must be reversed. Judgment reversed accordingly.